**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**PINE BLUFF DIVISION**

LARRY WAYNE JONES,
ADC #70147                                                                                    PLAINTIFF

5:12CV00423-JLH-JTK

DARRYL GOLDEN, et al.                                                                  DEFENDANTS

**PROPOSED FINDINGS AND RECOMMENDATIONS**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Judge J.

Leon Holmes.  Any party may serve and file written objections to this recommendation.  Objections

should be specific and should include the factual or legal basis for the objection.  If the objection

is to a factual finding, specifically identify that finding and the evidence that supports your

objection.  An original and one copy of your objections must be received in the office of the United

States District Court Clerk no later than fourteen (14) days from the date of the findings and

recommendations.  The copy will be furnished to the opposing party.   Failure to file timely

objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or

additional evidence, and to have a hearing for this purpose before the District Judge, you must, at

the same time that you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

2.      Why the evidence proffered at the hearing before the District Judge (if such a

hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.      The detail of any testimony desired to be introduced at the hearing before the District

Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Suite A149
Little Rock, AR 72201-3325

**DISPOSITION**

An Evidentiary Hearing was held in this case before the Court on December 17, 2014. Following a presentation of the testimonies of the parties and witnesses, and submission of exhibits and post-trial briefs (Doc. Nos. 119-120), the Court enters the following Proposed Findings and Recommended Disposition.

**I.      Introduction**

Plaintiff Jones is a state inmate incarcerated at the Varner Super Max Unit of the Arkansas Department of Correction (ADC). He filed this action pro se, pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights with respect to the denial of three World War II books he ordered and one issue of a monthly book catalog. (Doc. No. 33) The publications were denied by the Varner Unit Publications Review Committee as containing gang signs/activity, in the form of swastikas. (Id., pp. 6-11) Jones also alleges a violation of his equal protection rights, claiming that other ADC inmates were allowed to receive similar publications through the mail. (Id., p. 13) Defendants are Darryl Golden, former Assistant Warden of the Varner Unit; Grant Harris, Deputy Director of the ADC; James Gibson, former Assistant Warden of the Varner Unit;

Jan Scussel, Staff Attorney for the ADC; Mark Wheeler, Chaplain for the ADC; Sheila Sharp, Deputy Director for the ADC; James Banks, Warden of the Varner Unit; Dinah Tyler, Deputy Director for the ADC; Raymond Naylor, Internal Affairs Administrator for the ADC; Virgia Allen, Mail Room Supervisor at the Varner Unit; and Larry May, Chief Deputy Director for the ADC. Plaintiff asks for injunctive relief.

## II.     Factual Findings

### A.     Hearing Testimony and Exhibits

#### 1.     Plaintiff Larry Wayne Jones

On March 10, 2010, Jones received a notice from Sherry Conrad, the mail room supervisor, that a book he ordered, "The Scourge of the Swastika: A History of Nazi War Crimes During World War II" (Plaintiff Exh. 7), had been forwarded to the publications review committee because of the depiction of gang signs.  Jones then received notice from Defendant Golden, chair of the committee, that the book was denied because of gang signs (swastika) on the front cover. (Plaintiff Exh. 8) Later, in August, 2011, two other books he ordered, "How Hitler Could Have Won World War II: The Fatal Errors that Led to Nazi Defeat," and "Inside the Nazi War Machine: How Three Generals Unleashed Hitler's Blitzkrieg upon the World," also were sent to the committee for review by Defendant Allen. (Plaintiff Exhs. 2, 12)  Plaintiff received notice from Defendant Banks that both books were rejected as a threat to security because of the gang signs on the cover.  (Plaintiff Exhs. 10, 14)

On January 10, 2012, Jones received a returned mail notice from Defendant Allen, stating that a letter or package from the Edward R. Hamilton Publishing Company was rejected as containing photographs of gang signs. (Plaintiff Exhs. 6, 17)  Jones thought this probably was a catalog which

he regularly received.   He filed this action claiming that all these denials violated his First Amendment free speech rights, and also his equal protection rights, because he assumed other inmates were allowed the same type of books.  He testified that while he could not present evidence of any specific examples of this, he previously was allowed to receive catalogs from the Hamilton Publishing Company, yet Defendants denied him the December, 2011, issue.   This denial occurred after he filed a grievance complaining that the mail room was playing a joke on him by allowing him to receive the catalog, which included pictures of swastikas, but not allowing him to order the books. He claims other inmates received the catalog and that he appeared to be the only inmate prevented from receiving books and catalogs.

While he understands that the prison is concerned about inmates receiving publications with swastikas and admits that some gangs do use the swastika as a sign, Jones objects to the denial of his books based solely on the appearance of the swastikas.  He also notes that although Defendant Harris told him books with swastikas would be allowed if they were ancillary to a central theme, Defendant Golden said anything containing a swastika was not permitted.   However, since Defendant Banks left as Warden in December, 2012, the new warden has permitted inmates to receive the catalogs and the books; Jones presented three such World War II books that he has been permitted to receive (Plaintiff Exhs. 19-21).

### 2.      Sherry Conrad

Ms. Conrad served as a mail room supervisor in 2010.  She was trained to recognize gang signs, such as a swastika.  She personally did not deny publications, but forwarded anything that potentially could be considered a threat to the publications review committee.   She did not recall any occasions in which she permitted mail with a swastika to be delivered prior to a review by the

committee.

### 3.    Defendant Darryl Golden

Golden was employed at the Varner Unit in 2010, and served on the publications review committee.  At that time, swastikas were not permitted on any books which they reviewed.  During that time gang activity was a growing problem at the ADC and decisions to deny materials including swastikas were in an effort to address the growing threat.  Plaintiff Jones was not singled out by the committee and Golden was not aware that any other inmates were allowed possession of books with swastikas.  Since that time, the committee reviews such publications based on both the symbols and the content.

The first book Plaintiff ordered, "The Scourge of the Swastika...," was reviewed for its content, but was denied mostly because of the appearance of the swastika on the front cover.  Gangs can use those depictions for improper purposes, such as recruiting and targeting enemies.  Golden admitted that the library contains similar books and that Plaintiff is free to borrow those, but cannot keep them on his person.  He also noted, however, that the prison is not permitted to edit books ordered by inmates (such as removing an offensive cover), because that sets forth grounds for other lawsuits and would become unmanageable.  However, if a similar book is purchased by the State for the library, the library is free to edit out offensive parts. While a publication depicting a swastika probably would be deemed unacceptable if ordered by an inmate, that same publication may be acceptable in the library after certain redactions.

### 4.    Defendant Grant Harris

Harris is a Deputy Director at the ADC who stated that there is not a complete ban on

inmates receiving publications that depict swastikas.  Inmates can receive books if the symbol is

determined to be ancillary to the purpose of the book.  All books are evaluated in their entirety.  He

reviewed the books at issue and said they were denied as threats to security because of the gang

signs on the cover.  He stated Plaintiff was not singled out by the committee and that the

committee's functions evolved based on changes in gangs and in corrections.  Each member of the

committee reviews a book and the committee discusses it and votes on whether it should be

permitted.  A book is judged based on its content and on any gang signs.  In referring to the

committee's decision on the book, "How Hitler Could have Won the War...," Harris admitted the

committee has improved its methods of recording reasons to support denials.  (Plaintiff Exhs. 1, 2)

Both the memo sent to Plaintiff and the committee review sheet denying the "Scourge of the

Swastika...," indicated that the denial was due to a gang sign on the front cover.  (Plaintiff Exhs. 7-9)

Harris admitted that the appearance of the swastika (gang sign) on the front cover was sufficient to

prohibit Jones from receiving the book.

Harris also reviewed the memos and committee review sheet of the book, "Inside the Nazi

War Machine...," and stated that the book was rejected because the front cover was a threat to

security. (Plaintiff Exh. 13)  Absent the front cover, Harris could not recall if there was anything else

about the book which was objectionable.  (Plaintiff Exhs. 12-13)  Harris stated that an inmate may

check out a book from the library for two weeks, and that if an inmate copied gang signs or other

contraband depicted in a book, he could be subject to a disciplinary violation.  He admitted that the

committee has become more specific in recording its reasons for disallowing a book and will even

refer to specific pages which cause them concern.  He summarized that each of the books at issue

displayed a swastika on the front cover, and that the ADC is not permitted to change or alter a

publication in order to remove impermissible parts.  He also acknowledged that while there is no

blanket policy prohibiting a book solely on the appearance of a swastika, the presence of a swastika

on the front cover could be sufficient justification to reject the book.[1]

### 5.      Defendant James Banks

Banks served as Warden of the Varner Unit from March, 2010, until December, 2012.

During that time, there was no blanket policy prohibiting inmates from receiving publications

containing a swastika.  In addressing the rejection of the Hamilton catalog, Banks stated that

decision followed a grievance Plaintiff filed complaining about the catalog.  Therefore, after

reviewing the grievance and the catalog, he decided no one should receive it.  He then reversed that

decision and permitted the catalog because the symbols were not the same as those displayed in

books.  Banks did not recall ever making a statement in another lawsuit that inmates should never

be permitted to receive any materials containing swastikas.  A blanket denial is not consistent with

ADC policy or practice.

He acknowledged that policies, gangs, and symbols change, and when reviewing a

publication, the symbol itself may prevent the publication from being permitted.  Gangs have been

known to post the symbols to advertise and to intimidate, creating tension with other gangs.

Although library books also could be used for this purpose, the central librarian usually reviews the

---

[1]The ADC Publications Policy, Administrative Directive (AD) 09-44, provides that the
Warden designates staff to review incoming publications and further provides guidelines for
their decision-making processes.  (Plaintiff Exh. 11) Publications that are recommended for
rejection are referred to the Warden for a final decision, based "on the contents of an individual
publication, not on the basis of a list of approved publications or previous issues."  (Id., p.3) The
decision to reject a publication may be appealed to the Central Office Publications Review
Committee, and options are provided to the inmate for disposing of unacceptable publications.
(Id.)

books before they are received in the unit libraries.  He could not specifically recall the content of

the books ordered by Plaintiff, and stated that if the swastika had not been on the cover of the books,

they might have been approved.  Finally, Banks stated that one possible accommodation would be

that an inmate could purchase a book that otherwise might be prohibited, donate it to the state where

the offensive part is removed, and then place it in the library.

### 6.      Defendant Virgia Allen

Allen has served as supervisor of the Varner mail room since November, 2010, and sent

Plaintiff the return mail notice of the Hamilton catalog in January, 2012.  At the time, Defendant

Banks instructed her that none of the inmates were permitted to receive the catalog. She is not a

decision-maker and if something questionable arrives in the mail room she forwards it to the

committee for review.  She could be disciplined if she knowingly permitted an inmate to receive a

publication which violated policy.

### 7.      Defendant Larry May

Prior to his retirement in 2013, May served as Chief Deputy Director for four to five years

and served on the publications review committee.  The committee did not have a blanket policy

against swastika material, and "The Scourge of the Swastika...," was denied because of the swastika

on the cover.  Despite the content of the book, the cover was considered a threat.  He could not

remember why "How Hitler Could have Won the War...," was denied, but assumed it was for the

same reason.  The committee reviewed each book individually to determine if it presented a threat

to the security of the institution.  While he could not say he would personally vote to ban every book

that displayed a swastika on the cover, he acknowledged that a larger swastika would cause greater

concern than a smaller one.

### 8.      Defendant James Gibson

As a member of the central office publications review committee, Gibson reviewed books individually and considered the size and reference of the objectionable signs.  He recalled affirming the denial of "The Scourge of the Swastika...," stating that gangs can display swastikas in a window, or slide them under a cell door, or flash the sign in an effort to recruit members or traffic contraband. In addition, possession of the symbol by an innocent inmate who is not a gang member might set him up as a target from a gang.  He recalled an incident which occurred a couple of months ago where hand signs were used to signal a gang to jump on prone victims, causing a diversion of staff and then allowing an attack on a white supremacist inmate.  While it is difficult to prevent hand gang symbols, the units try to control the use of the symbols in other forms as much as possible.

### 9.      Inmate Eric Ford

Inmate Ford testified that he has received the Hamilton books catalog through the mail since 2008, and received the monthly issue which Jones was prevented from receiving.  He stated he has never ordered a book with a swastika on the cover.

## III.    Legal Conclusions

### A.      Fourteenth Amendment - Equal Protection

The Equal Protection Clause requires that "all persons similarly situated should be treated alike," and extends to prison inmates.  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985); Turner v. Safley, 482 U.S. 78, 84 (1987).  "However, in prison cases, courts will ordinarily defer to the expert judgment of prison authorities, due to the difficulty of running a prison and the commitment of the task to the responsibility of the legislative and executive branches." Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999).

In this case, Jones claims that other inmates received books with swastikas.  However, he presented no evidence to support this claim, and admitted in his testimony that he "assumed" other inmates received such books, but that he did not know of any specific incidents or examples.  While there is no dispute that Plaintiff did not receive one issue of the book catalog, Defendants adequately explained the reason for this and Plaintiff produced no evidence that they intended to single out Plaintiff.  Rather, Plaintiff admitted filing a grievance in which he appeared to complain about having received the catalog with its swastika depictions; based on this complaint, Defendant Banks agreed it was improper and instructed the mail room to return all the catalogs.  However, after further reflection (apparently no more than a month later), the catalogs were permitted.  The Court finds Plaintiff fails to bear the burden of proving dissimilar treatment, despite his contention that his claim is proven by Defendants' own failure to present evidence that they rejected other inmates' World War II publications solely based on the presence of a swastika.  Therefore, the Court finds no evidence to support Plaintiff's Fourteenth Amendment claim.

## B.    First Amendment - Free Speech

When faced with a free exercise claim, courts should consider the following: whether there is a valid rational connection between the regulation and the governmental interest, whether an alternative means is available to the prison inmates to exercise their right, whether an accommodation would have a significant effect on guards, inmates and prison resources, and whether there is an available alternative which accommodates the prisoner at a de minimis cost. Turner v. Safley, 482 U.S. 78, 89-90 (1987).  Regulations which permit censoring incoming items likely to incite violence have been considered related to institutional needs of maintaining "a controlled and secure environment among the prison population." Murphy v. Missouri Department

of Corrections, 372 F.3d 979, 986 (8th Cir. 2004).  In Murphy, the court stated that a total ban on

publications which espouse white supremacy is overly broad, and that the courts should consider

"whether a ban on these particular items is reasonably related to a legitimate penological objective."

Id.

Defendants claim that they do not totally ban publications which depict swastikas, and note

that Plaintiff produced evidence that he has been permitted to receive several books which include

the symbol. (Exhs. 19-21)[2]  ADC officials testified about the concern such symbols pose in light of

the prison gang population and the need for maintaining control and security, and Plaintiff admitted

the need for such concern.  In addition, Defendants state that Plaintiff is permitted to borrow World

War II books from the unit libraries which may contained some images of swastikas, but that

Plaintiff presented no evidence that any library books have covers which prominently display the

swastika.  While the libraries can alter or remove objectionable items, Defendants note that such an

accommodation with respect to books purchased by inmates is not feasible.[3]

In response, Plaintiff claims that the inconsistency of Defendants' treatment of books – by

permitting some library books which contain the swastika but denying the books which he ordered

– supports a finding of no legitimate penological interest to justify their rejection.  "Condemnation

---

[2]These books are: "Judgment Before Nuremberg," "Berlin at War," and "The Life and Legends: Simon Wiesenthal."  A small (1/4 inch in size) swastika does appear at the bottom on the cover of "Judgment Before Nuremberg," but the other two books do not have swastikas on the covers. (Plaintiff Exhs. 19-21)

[3]Defendants also argue in their post-trial brief that they are protected from liability by qualified immunity.  However, qualified immunity does not apply when a claimant sues for injunctive relief.  Qualified immunity "protects government officials 'from liability for **civil damages** insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Stepnes v. Ritschel, 663 F.3d 952, 960 (8th Cir. 2011) (quoting Pearson v. Callahan, 555 U.S.223, 231 (2009) (emphasis added)).

of the swastikas borne by Plaintiff's publications and labeled threatening "gang signs" and "STG" symbols by Defendants is nullified, however, by the permissibility of equally threatening sources of the swastika."   (Doc. No. 120, p. 5)   Furthermore, permitting him to receive the rejected publications is an alternative which fully accommodates his rights at de minimis cost, because Defendants did not present evidence that the publications he has been permitted to receive caused a significant disruption.

Courts have acknowledged the concern posed by prison officials over the use of a swastika. "The swastika is a symbol historically associated with Nazism, Hitler and neo-nazis organizations, as well as with oppression and genocide directed toward racial, religious and ethnic minority groups.....in western cultures the primary significance of the swastika is its association with white supremacy." Hoeft v. Lewallen, No. 09-cv-121-wmc, 2010 WL 1687871 *1 (W.D.Wis) (court held the confiscation of a swastika drawing from an inmate did not violate his First Amendment right to freedom of religion, or the Religious Land Use and Institutionalized Persons Act (RLUIPA)).  The swastika has been "associated with racist and white supremacist groups for over half of a century – groups, not surprisingly, that are not recognized by the warden." Koutnik v. Brown, 456 F.3d 777, 783 (7th Cir. 2006) (prison regulation which prohibited prisoners from possessing symbolism – in this case, a swastika – that could be associated with any inmate group not approved by the warden did not violate inmate's First Amendment free speech rights).  "Regardless of its ancient or historic origins, the swastika today is a potent symbol of intolerance, hatred, and violence.  As such, prison officials may have a valid penological interest in prohibiting the wearing of swastikas." Dickinson v. Austin, No. 90-15100, 1991 WL 166411 *2 (9th Cir.) (where the court held that the confiscation

of a swastika necklace did not violate an inmate's right to freedom of religion.) [4]

Reviewing the facts of this case in light of the Turner factors, the Court first finds that Defendants presented proof of a legitimate governmental interest in security, which was not denied or rebutted by the Plaintiff.  In fact, Plaintiff agreed that prison gangs use the swastika sign for improper means.  Plaintiff also admitted that he was not challenging the prison regulation itself, but the way in which it was applied to him.  However, he provided no proof that the reasons for denying the publications set forth by the committee members, were not rationally connected to the legitimate purpose in maintaining security.  In addition, Defendants presented evidence of alternative means available to inmates – in the form of checking out similar books from the Unit law library, or ordering publications and donating them to the State for placement in the library – which would allow Plaintiff to exercise his right to read World War II books and other publications.  Defendants also provided testimony that accommodating Plaintiff by allowing him to order such books would have a significant effect on guards, inmates and resources, due to the potential misuse of the symbol by gangs to recruit or intimidate other inmates.  Finally, in terms of available accommodations, Defendants testified that policy prohibits them from removing or editing publications ordered by

---

[4] Other cases involving the prohibition of swastikas include:  Lindell v. Casperson, 360 F.Supp.2d 932 (W.D.Wis. 2005) (where the court held that prohibition of religious texts displaying pictures of swastikas did not violate the First Amendment or RLUIPA); Rowe v. Indiana Dep't of Correction, No. 1:11cv00524-JMS-MJD, 2014 WL 819418 (S.D.Ind.)(where the court held that prohibiting an inmate from possessing a swastika necklace did not violate his First Amendment rights); Rooks v. Zavares, No. Civ.A. 99-B-631, 2001 WL 34047959 (D.Colo.)(where the court held that the confiscation of a swastika medallion from an inmate was rationally related to legitimate security interests and did not violate the plaintiff's First Amendment free exercise rights); Pike v. Gomez, No. C-91-2114 MHP, 1993 WL 343134 (N.D.Ca.)(prison regulation requiring removal of a swastika picture from an inmate's wall was justified under Turner).

inmates in order to remove offensive portions, and furthermore such actions would cause additional censorship and other problems which could easily become unmanageable. Plaintiff did not provide proof of other available alternatives, other than Defendant Banks' suggestion that an inmate order a book, and donate it to the State for placement in the library, where offensive portions could legitimately be removed. The Court notes that while it finds that Plaintiff has failed to prove his burden that Defendants' actions violated his First Amendment rights, Defendants in the future should explore alternatives to accommodate his and other inmates' interests, such as the donation of books to the State for placement in the library, or a system which permits inmates to order such materials with the understanding that prison officials could redact offensive portions (inmates would sign a release of liability-type form concerning the redactions).

## IV.     Conclusion

In conclusion, the Court finds that Plaintiff did not prove his claims against Defendants by the preponderance of the evidence, and that Defendants should have judgment against Plaintiff on his claims against them. Accordingly,

IT IS, THEREFORE, RECOMMENDED that Defendants have judgment over Plaintiff on his First Amendment and Fourteenth Amendment Claims, and that Plaintiff's complaint be DISMISSED with prejudice.

IT IS SO RECOMMENDED this16th  day of January, 2015.

_____
       JEROME T. KEARNEY
       UNITED STATES MAGISTRATE JUDGE